**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

PAIGE D. DEBORD,

                   **Plaintiff,**

      **v.**

CAROLYN W. COLVIN, Commissioner
of Social Security;

                 **Defendant.**

**8:16CV210**

**MEMORANDUM
AND ORDER**

This matter is before the Court the Motion to Reverse Commissioner's Decision, ECF No. 16, filed by Plaintiff Paige Debord, and the Motion to Affirm Commissioner's Decision, ECF No. 14, filed by Defendant Carolyn Colvin, Commissioner of Social Security.  Both motions are filed pursuant to Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–85.  For the reasons stated below, the Motion to Reverse will be denied, and the Motion to Affirm will be granted.

**PROCEDURAL HISTORY**

Debord filed for Title II benefits on December 2, 2013.  Tr. 73.[1]  Debord's claim was denied initially, and on reconsideration, and a hearing was held on February 13, 2015.  The ALJ issued an opinion on March 26, 2015, denying benefits.  Debord requested review of the ALJ decision by the Appeals Council, which denied the request, thus making the ALJ's decision final.  Tr. 1.

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or

---

[1] Pinpoint citations to the transcript of the Administrative Record ("Tr.") shall be to the consecutively numbered pages in the record rather than to the Page ID of the docket.

is found to be "disabled" at step three or step five.  *See id.*  Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  *See* 20 C.F.R. § 404.1520(a)(4)(i), (b).  The ALJ found that Debord had not been engaged in substantial gainful activity since November 16, 2013, which was her reported onset date. Tr. 13.

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Debord had the following severe impairments: major depression, generalized anxiety disorder, post-traumatic stress disorder ("PTSD"), borderline personality disorder, and a history of alcohol and opioid dependence.  Tr. 13.

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part

2

404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).   If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."   *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d).   If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.   *See* 20 C.F.R. § 404.1520(a).   The ALJ found that Debord did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.   Tr. 14.

Step four requires the ALJ to consider the claimant's residual functional capacity ("RFC")[2] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work."   *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).   If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f).   The ALJ found that Debord had the RFC to perform a full range of work at all exertional levels but also that Debord was limited to simple, repetitive, and routine work tasks with only simple workplace decision-making and only occasional interactions with the public.   Tr. 16.   The ALJ found that Debord was unable to perform past relevant work as a forklift driver, which involved greater capacity for understanding, remembering, carrying out complex tasks than could be tolerated under Debord's RFC.   Tr. 20–21.

At step five, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work experience.   20 C.F.R. § 404.1520(g).   If the claimant is able to do other work, she is not disabled.   The ALJ

---

[2]   "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments."   *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

determined that there are jobs that exist in significant numbers in the national economy that Debord could perform, and, therefore, Debord was not disabled from November 16, 2013, to the date of the decision, March 26, 2015.  Tr. 21–22.

## FACTUAL BACKGROUND

Debord was born in 1967, Tr. 11, and graduated from high school in 1985.  Tr. 498.  She previously worked as a forklift operator, a position classified as semi-skilled and medium exertion.  Tr. 231.

### I. Medical Opinion Evidence

From December 12, 2013, to December 2, 2014, Debord was seen multiple times by therapists at Inroads Counseling.  Throughout these visits, Debord retained a Global Assessment of Functions ("GAF") score of 50.[3]  Tr. 390, 392, 394, 397, 399, 401, 404, 435, 437, 439, 441, 443, 445, 447, 449, 452, 455, 461, 464, 466, 468, 470. At her October 2014 and November 2014 appointments, she was recorded as having no suicidal thoughts or sleep difficulties, and her thought process was listed as goal directed. Tr. 467–70.   Although she stated she was able to maintain household responsibilities at her October appointment, Tr. 467, she stated she could no longer maintain them by November.  Tr. 469.  As of December 3, 2014, she was listed as taking Zoloft, Wellbutrin SR, Trazodone, Xanax as needed, Buspar, and Hydroxine.  Tr. 472.

---

[3]  A GAF score of 41 to 50 indicates serious impairments of function, while a score of 51 to 60 indicates moderate difficulty in occupational functioning.  American Psychiatric Association, *The Diagnostic and Statistical Manual of Mental Disorders* [hereinafter DSM-IV], at 34 (Am. Psychiatric Ass'n 4th ed.) (1994).  Thus, Debord scored on the high end of serious impairment, one point away from having only moderate symptoms.

On December 15, 2013, Debord's spouse, Jesse Debord completed a questionnaire describing his wife's behavior.  Jesse Debord noted that his wife did not have much interest in television, socializing, or other activities she used to enjoy, such as crocheting.  Tr. 198–99.  In stressful situations, Jesse Debord stated that his wife "look[ed] overwhelmed," became "panicky" and "very quiet," and would cry.  Tr. 199.  He also stated that when plans or "situations suddenly change[d]," she would not "react well" and "kind of panic."  Tr. 199.  Jesse Debord reported that Debord took care of their daughter and did some chores.  He also mentioned that she got along well with clerks when he took her to the store, and that her ability to care for herself had not been affected by the suicide attempt.  Tr. 198.  He ended the report stating that his wife was a very active individual but very depressed and inactive following a suicide attempt.  Tr. 200.

On November 24, 2014, Debord was evaluated for psychological functioning by Rosanna Jones-Thurman, Ph.D.  Jones-Thurman first noted that Debord's "response style may indicate a broad tendency to magnify the level of experienced illness . . . ."  Tr. 502.  Jones-Thurman reported that Debord "evinces an agitated, major depression" and that she "anxiously expressed suicidal thoughts, and outbursts of bitter resentment interwoven with a demanding irritability towards others."  Tr. 504.  Jones-Thurman stated that Debord "appears to be experiencing a severe psychotic episode characterized by bizarre thinking and fragmented emotions, perhaps a phase of an extended schizophrenic course."  Tr. 504.  Jones-Thurman noted that Debord's "memory for immediate, recent, and remote events was grossly intact," that "[h]er concentration and attention were intact," and that [h]er thought organization was

5

coherent and logical." Tr. 501. Jones-Thurman's diagnostic impressions included Schizoaffective Disorder, Generalized Anxiety Disorder, Post-Traumatic Stress Disorder, Alcohol Use Disorder, and Schizoid Personality Disorder. Tr. 506. She did not assign a GAF score.

On January 5, 2015, Debord was evaluated for psychological functioning by Patricia Blake, Ph.D. Tr. 473–81. Blake found that Debord was "oriented," but that she "acted puzzled for purposes of the interview." Tr. 475. Blake observed that Debord was "irritable and rather agitated" and that her "[a]ffect was variable and occasionally inappropriate." Tr. 475.

Blake found that Debord's answer to certain questions "suggest[ed] adequate concentration needed for task completion." Tr. 475. Blake concluded that Debord has "slight" impairment when it came to "carry[ing] out detailed instructions" and "[t]he ability to make judgments on simple work-related decisions," but no other work-related impairments. Tr. 477–78. Blake estimated that Debord had a GAF score of 64, indicating a mild range of symptoms.[4] Tr. 476.

On January 9, 2015, Debord was evaluated for psychological functioning by Michael Coy, M.D. Tr. 482–89. Coy completed a medical source statement, in which he diagnosed Debord with Schizoaffective Disorder, Generalized Anxiety, PTSD, and "Borderline Personality." Tr. 482. He concluded that "Schizoaffective Disorder prevents [Debord] from working," and assigned her a GAF score of 35.[5] Tr. 482, 485–86.

---

[4] DSM-IV, *supra*, at 34.
[5] A GAF score of 35 indicates major impairments in several areas, including the ability to work. DSM-IV, *supra*, at 34.

6

On January 8, 2014, Lisa Schmechel, Ph.D., a non-examining psychological consultant, evaluated Debord for psychological functioning as part of the initial disability determination.  Tr. 72–80.  On February 6, 2014, Rebecca Braymen, Ph.D., another non-examining psychological consultant, evaluated Debord for psychological functioning as part of the reconsideration disability determination.  Tr. 82–91.  Both found the claimant to have, at most, moderate limitations in terms of her memory and ability to follow instructions for work tasks.

## II. Hearing Evidence

Debord testified that she was unable to work due to her fragile mental state and that she suffered from anxiety, depression, and an inability to concentrate.  Debord worked as a forklift operator for fifteen years, Tr. 41, and she testified  that her work was satisfactory to her employer for the most part.  Tr. 49.  However, she began calling in sick frequently due to her anxiety.  Tr. 50.  When she was at work, she would need to go to a secluded area or the restroom to cry and calm down, often doing so multiple times within a sixty-minute period.  She testified that she would often take different routes to the restroom to conceal how frequently she was going.  Tr. 50.

Debord was no longer working as a forklift operator at the time of the hearing.  She testified that she struggled to perform household chores during her time at home.  Tr. 42–43.  While she would make the bed daily and did some laundry, a task such as cleaning the bathroom could take up to two hours.  Tr. 49.  Debord testified that she only minimally assisted in the raising of her daughter, who was almost ten years old at the time of the hearing.  Tr. 42.  She testified that she could not concentrate sufficiently to use a computer.  Tr. 44–45.

7

At the time of the hearing, she was experiencing panic attacks three to five times a week.  Tr. 44.  She also experienced nightmares and racing thoughts on a nightly basis, which interfered with her sleep and led to fatigue.  Tr. 53–54.  She testified that she experienced crying spells several times daily.  Tr. 52.

Debord testified that she had difficulty attending social events or running errands out of her house.  Tr. 45–46.  She used to go to church but could not get through the service without having to leave early.  Tr. 45.  When she attended her daughter's swimming events, the heat and commotion would require her to step out frequently and "go in the bathroom and deal with [her anxiety]."  Tr. 46.  She could only recall one instance where she had gone to a store without her husband in the recent past, and that doing so tended to trigger an anxiety attack.  Tr. 43.  She testified that her mood swings made her irritable and that she tended to "just blow up" with people.  Tr. 53.  Although she used to take walks outside to manage her stress, her fear of being attacked by people she encountered prevented her from continuing to do so.  Tr. 55.

She also testified to seeing things that were not there when she was a passenger in cars and that, when she goes to bed, she hears human voices that are not present, such that "[i]t sounds like a cocktail party, people talking."  Tr. 55–56.

Debord testified to abusing alcohol on at least one occasion, in November of 2013, when she became severely intoxicated, ingested "two handfuls" of Benadryl, and was admitted to an ICU.  Tr. 50. Her testimony indicates that it was at least her fourth suicide attempt.  Tr. 54.  She testified that she had not abused drugs or alcohol since that time.  Tr. 50.

She testified to taking Zoloft, Xanax, Trazadone for sleep, and Wellbutrin SR. She claimed to have taken at least four Xanax prior to testifying the day of the hearing. Tr. 57.

Steven Kuhn, a vocational expert, also testified at the hearing.  Tr. 58.  While testifying, the ALJ posed a hypothetical question to Kuhn:

> Assuming a hypothetical individual the same age, education and past work as an industrial truck operator, forklift operator.  Further, the individual is limited to only simple, routine and repetitive work.  Specifically requires only simple work-related decisions.  And the individual should have only occasional interaction with the general public.  Could the hypothetical individual do the past work of the claimant as either actually or generally performed?

Tr. 60.

Kuhn stated that such a hypothetical claimant could not perform work as a forklift operator, because such work is semi-skilled.  Tr. 60.  However, Kuhn stated that the hypothetical person could perform other work that existed in the national economy, such as a production assembler, for which there exist about 200,000 positions nationally, and as a cleaner, for which there exist about 350,000 positions nationally.  Tr. 60.  The ALJ then posed a second hypothetical question:

> Now if we take that hypothetical individual and the same hypothetical, but adding that given psychiatric symptoms and difficulty such as focusing, the individual would need at least two additional unscheduled breaks during the workday.  And would be absent from work more than four days per month.  I'm presuming the past work would remain unavailable.  So would the hypothetical individual be able to perform any other work?

Tr. 61.

Kuhn testified that under the second hypothetical, the individual would not be able to maintain work as it is typically performed in the national economy, primarily due to the absenteeism.  Tr. 61–62.

## STANDARD OF REVIEW

"When considering whether the ALJ properly denied social security benefits, [the Court] determine[s] whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole."  *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal quotation marks omitted) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)).  "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion."  *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the Court's "review extends beyond examining the record to find substantial evidence in support of the ALJ's decision."  *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) (internal quotation marks omitted) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)).  The Court must "also consider evidence in the record that fairly detracts from that decision."  *Id.* (internal quotation marks omitted) (quoting *Cox*, 495 F.3d at 617).

Additionally, the Court must determine whether the Commissioner's decision "is based on legal error."  *Collins*, 648 F.3d at 871 (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous

10

legal standards, or an incorrect application of the law." *Id.* (internal citations omitted) (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)).   No deference is owed to the Commissioner's legal conclusions.   *Brueggemann*, 348 F.3d at 692 (stating that allegations of legal error are reviewed de novo).

## DISCUSSION

First, Debord argues that the ALJ's decision is not supported by substantial evidence based on the record as a whole.  Namely, Debord argues that the ALJ erred by assigning only little weight to the opinion of Debord's treating physician, Dr. Michael Coy.  The ALJ assigned little weight to the opinion because Coy's conclusions were "simply inconsistent with any previous or subsequent medical evidence of record," which consistently showed a GAF score of 50 or above.  Tr. 19.  Debord argues that this conclusion violates the Treating Source Rule and is erroneous.

Under the Treating Source Rule, a treating source's opinion on the nature and severity of a claimant's impairments will be given controlling weight if it "is not inconsistent with the other substantial evidence" in the case record.   20 C.F.R. § 404.1527; *see Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)).  Also, "[e]ven if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."  *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (internal quotation marks omitted) (alteration in orginal) (quoting *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007)).

However, "a treating physician's opinion does not automatically control, since the record must be evaluated as a whole."  *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th

Cir. 2012) (internal quotation marks omitted) (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)).  "Opinions of treating physicians typically are entitled to at least substantial weight, but may be given limited weight if they are conclusory or inconsistent with the record."  *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016).  Also, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)).

As the ALJ stated, Dr. Coy's opinion was inconsistent with the other substantial evidence in the record as well as Dr. Coy's prior examinations.  This included the opinions of both non-examining consultants, Schmechel and Braymen.  While non-examining reports do not, in and of themselves, constitute substantial evidence on the record, *Brock v. Secretary of Health and Human Services*, 791 F.2d 112, 114 (8th Cir. 1986), the reports in this case do not stand alone.  Debord's records at Inroads counseling show a consistent GAF score of 50 over twenty-two visits, spanning twelve months.  Tr. 390–470.  Coy's own notes state that Debord was maintaining responsibilities at home and that her thought process was goal-directed with average productivity.  Tr. 467–70.

Because of the evidence in the record and the inconsistencies in Coy's reports, the ALJ's decision to afford little weight to Coy's opinion is not error.  *See Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) (finding no error where ALJ discounted

12

treating source opinion because ALJ "did not rely solely on the reviewing physicians" and "conducted an independent analysis of the medical evidence").

Debord also argues that the ALJ erroneously assigned great or substantial weight to the opinions of Jones-Thurman and Blake. Debord argues that the ALJ "glossed over" the portions of Jones-Thurman's report that indicated more severe impairment while adopting her moderate impairment indicators. ECF No. 13, Page ID 575. Debord states that the ALJ should not have relied on Blake's report, because it was so "divergent" from the ALJ's conclusions. ECF No. 13, Page ID 576. Both reports provide substantial support to the ALJ's decision, and both are more consistent with the overall record than Coy's opinion.

As with Jones-Thurman and Blake, Debord claims the ALJ relied on Debord's spouse's opinion while overlooking the "severe limitations he reported." ECF No. 13, Page ID 577. Debord's spouse testified that he took Debord to stores where she "[got] along with clerks," and that she cared for their daughter; and his testimony was consistent with the bulk of the record suggesting that Debord had moderate limitations. Tr. 198–99. The ALJ properly relied on it in reaching his overall conclusion, which is supported by substantial evidence in the record.

Debord also argues that the testimony of the vocational expert did "not constitute substantial evidence upon which the ALJ can rely." ECF No. 13, Page ID 578. Essentially, Debord argues that because the hypothetical questions which the ALJ posed to the vocational expert were based on the ALJ's erroneous RFC finding, the questions did not accurately reflect Debord's actual limitations. While "testimony elicited by hypothetical questions that do not relate with precision all of a claimant's

13

impairments cannot constitute substantial evidence," *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 378 (8th Cir. 2016) (internal quotation marks omitted) (quoting *Ekeland v. Bowen*, 899 F.2d 719, 722 (8th Cir.1990)), such is not the case here.  Rather, for the reasons stated above, the ALJ's findings regarding Debord's RFC were supported by substantial evidence in the record.  Therefore, the questions posed to the vocational expert accurately reflected Debord's limitations, and the ALJ could rely upon the vocational expert's responses.  *See Hlebechuk v. Massanari*, 18 F. App'x 446, 448 (8th Cir. 2001) (citing *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001); *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001)) ("[A] vocational expert need only consider impairments supported by substantial evidence in the record and accepted by the ALJ as true.").

## CONCLUSION

For the reasons stated above, the ALJ's conclusions are not erroneous and are supported by substantial evidence appearing on the record.  The Motion to Reverse will be denied, and the Motion to Affirm will be granted.  Accordingly,

IT IS ORDERED:

1. Defendant Carolyn Colvin's Motion Affirm Commissioner's Decision, ECF No. 14, is granted;

2. Plaintiff Paige Debord's Motion to Reverse Commissioner's Decision, ECF No. 16, is denied;

3. The Commissioner's decision is affirmed;

4. The appeal is denied;

5. A separate judgment will be entered.

14

Dated this 22nd day of December, 2016

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge